IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TINA F. CHEVALIER,

        Plaintiff,

  v.                                            Civil Action 2:15-cv-2393
                                                  Judge Michael H. Watson
                                                  Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Tina F. Chevalier, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking review of the Commissioner of Social Security's (the "Commissioner") denial of her application for supplemental social security income. For the reasons that follow, it is **RECOMMENDED** that the District Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the Administrative law Judge ("ALJ") under Sentence Four of § 405(g).

### I.  BACKGROUND

**A. Prior Proceedings**

Plaintiff applied for supplemental social security income on September 22, 2011, alleging a disability onset date of July 2, 2006. (*See* Doc. 9 at Tr. 12, PAGEID #: 55). Her case proceeded to a hearing before an ALJ on July 3, 2013. After a brief exchange with Plaintiff's counsel, the ALJ continued the hearing to allow Plaintiff to undergo a consultative examination regarding her knee pain. (*See id.* at Tr. 84, PAGEID #: 127). Plaintiff underwent the consultative examination, and the ALJ subsequently held the second administrative hearing on

December 23, 2013.  The ALJ denied benefits on January 9, 2014.  (*See id.* at Tr. 9, PAGEID #: 52).  That decision became final when the Appeals Council denied review on April 14, 2015.  (*See id.* at Tr. 1, PAGEID #: 44).  Plaintiff then brought this action.  (*See* Doc. 9 (administrative record); Doc. 10 (statement of errors); Doc. 15 (the Commissioner's response); Doc. 16 (Plaintiff's reply)).

**B. The Record**

    **1. The First Hearing**

After providing brief background about Plaintiff, Plaintiff's counsel argued the ALJ needed more information to reach a decision about Plaintiff's knee pain.  Counsel and the ALJ had the following exchange:

> [ATTY:] . . . . However, I would also note that since her records particularly note complaints related to her knees and falls related to her knees specifically and since she may well meet the grids if she happens to be reduced to sedentary at 201.09 based on her education and no past work, we would ask that you consider sending her out for a physical CE, specifically with x-rays of both her knees . . . *if Your Honor feels this evidence would be necessary before you could come to a final decision*.
>
> ALJ: Mr. Carpenter, I think I will order the consultative examination and the x-rays of the knee.  I think I would prefer to then wait to question Ms. Chevalier until we can hold our supplemental hearing so that I think I will . . . conclude today's hearing.

(Doc. 9 at Tr. 84, PAGEID #: 127 (emphasis added)).  The ALJ continued the proceedings and scheduled a second hearing pending the consultative examination and x-rays.

    **2. Dr. Kimbrough's Report**

At the request of the ALJ, Dr. Kimbrough performed Plaintiff's consultative evaluation on August 1, 2013, after which he issued a written report.  (*See* Doc. 9 at Tr. 458, PAGEID #: 501).  Plaintiff told Dr. Kimbrough that her knees had bothered her for about a year, ever since she fell down the stairs at her apartment.  The report found "no significant tenderness to

2

palpation in . . . the knees." (*Id.* at Tr. 459, PAGEID #: 502). It also noted Plaintiff's knee pain was "located at the margins of the kneecaps" and sometimes "radiate[d] into her right hip." (*Id.*). It further described her pain as "sharp in nature" and "made worse by lifting and climbing stairs." (*Id.*).

Dr. Kimbrough completed a number of charts based on his examination. One indicated Plaintiff's knee strength was normal. (*See id.* at Tr. 461, PAGEID #: 504). Another concluded Plaintiff would have no problem lifting up to 10 pounds, could frequently lift between 11 and 20 pounds, could occasionally carry between 21 and 50 pounds, and never could carry between 51 and 100 pounds. (*See id.* at Tr. 465, PAGEID #: 508). Dr. Kimbrough further noted Plaintiff could sit for up to 30 minutes at time and stand and walk for up to 20. (*See id.* at Tr. 466, PAGEID #: 509). In his opinion, Plaintiff could occasionally climb stairs, balance, stop, kneel, or crouch, and never crawl, or climb ladders or scaffolds. (*See id.* at Tr. 468, PAGEID #: 511).

Finally, Dr. Kimbrough's report contained the following section titled "Diagnostic Imaging":

> Radiographs of the lateral right and left knees were obtained in obliquity limiting assessment for effusion. No erosive changes were identified on the provided views. AP images were technically unsuccessful bilaterally, limiting assessment for joint narrowing. No fractures were seen.

(*Id.* at Tr. 460, PAGEID #: 503).

### 3. The Second Hearing

#### a. Plaintiff's Testimony

After Plaintiff underwent the consultative examination in August of 2013, the second hearing took place on December 23, 2013. At the time of the hearing, Plaintiff lived with and cared for her nine-year-old granddaughter, was 51 years old, had a ninth-grade education, and

3

did not work. She had not worked since filing her application for benefits in September of 2011. (*See id.* at Tr. 50–53, PAGEID #: 93–96).

Plaintiff testified about her knee pain. She said that she does not "drink much milk" and therefore "ha[s] a lot of pain down [her] knees," "mostly" when walking up or down stairs. (*Id.* at Tr. 55, PAGEID #: 98). Her attorney asked if she had ever fallen and, if so, how many times. She said that she had, recalling "one time really bad" and several other times she almost had fallen but "caught [her]self." (*Id.*). After her bad fall, her doctor "sent a note into [he]r apartment complex" so she could live on the first floor. (*Id.* at Tr. 56, PAGEID #: 99). Plaintiff also testified that she is able to walk "at least a half an hour" before needing to take a break, but that her knees bother her when she walks and when she has to lift something. (*Id.*).

According to Plaintiff's testimony, her granddaughter helps Plaintiff with chores around the house. For example, she helps her with sweeping, vacuuming, and doing the dishes. When they lived on the second floor apartment, her granddaughter carried the laundry up the stairs because it was too heavy for Plaintiff. (*See id.* at Tr. 58, PAGEID #: 99).

Plaintiff also testified about pain management. She takes 800mg of ibuprofen three times a day at the direction of her doctor. (*See id.* at Tr. 59–60, PAGEID #: 102–03). Her knees bothered her enough that her treating physician wanted her to see a specialist "to put needles in [her] knee" for her "pain to quit hurting." (*Id.* at Tr. 73, PAGEID #: 116). Plaintiff decided not to see the specialist, explaining that "the ibuprofen ha[d] been helping me a lot" and that she is "nervous around needles." (*Id.*). At the hearing, she testified she "would consider" going to see the specialist for therapy. (*Id.* at Tr. 74, PAGEID #: 117).

4

### b. Dr. Brendemuehl's Testimony

Dr. Brendemuehl testified as the medical expert at the second hearing. She based her opinion about Plaintiff's knees on what she called "the only [medical assessment] in the file": Dr. Kimbrough's report from the consultative examination. (*Id.* at Tr. 41, PAGEID #: 84). Given Dr. Kimbrough's report, she recommended the following limitations: "a light exertional level of activity" (Doc. 9 at Tr. 40, PAGEID #: 83), no ladders, ropes, scaffolds, kneeling or crawling (*see id.*), occasional stooping, crouching, stairs, and ramps (*id.* at Tr. 41, PAGEID #: 84), and to avoid all heights, hazardous machinery, and extreme heat and cold (*id.*).

Dr. Brendemuehl also noted what she saw as a number of deficiencies in Dr. Kimbrough's report. For example, Dr. Kimbrough's conclusions as to Plaintiff's limitations and restrictions "were based on claimant's supplied restrictions as opposed to restrictions based on a physical exam or objective evidence." (*Id.* at Tr. 42, PAGEID #85; *see also id.* (noting the report's "only physical evaluation" was a "comment that the knees and the back were non-tender")). She said the x-rays cited in the report were "not interpretable" (*id.*), and noted that Dr. Kimbrough himself "reported that the [x-ray] views that were obtained were the wrong views and also that the quality of films was poor" (*id.* at Tr. 46, PAGEID # 89). When asked whether a better quality x-ray of the knees could help explain Plaintiff's pain, Dr. Brendemuehl said, "Well, it'd help certainly. The x-rays are what – the first step for looking to find [the explanation]." (*Id.*).

Later in the hearing, Plaintiff's counsel asked Dr. Brendemuehl about the specific findings of the examination report. Dr. Brendemuehl responded first by saying she was "a little taken aback by this evaluation" (*id.* at Tr. 48, PAGEID #: 91), and that she has read "several thousand" reports and they normally include "a description of the gait," "heel/toe maneuvers,"

and other descriptions regarding the physical state of the examinee (*id.* at Tr. 49, PAGEID #: 92). In this instance, by contrast, Dr. Brendemuehl noted Dr. Kimbrough's report was "a very cursory exam and the report is – is really not the usual in-depth physical exam that I often read."  (*Id.*).

### c. Plaintiff's Request for Another Consultative Examination

After Dr. Brendemuehl's testimony, Plaintiff's counsel asked the ALJ to order another consultative examination, arguing it was "not the claimant's fault that there was bad imaging done."  (Doc. 9 at Tr. 46, PAGEID #: 89).  He also explained that he originally requested the exam to "develop the record and really see exactly if there's objective proof to demonstrate why she's having these complaints."  (*Id.*).  He further argued that the x-rays "make[] a huge difference" in Plaintiff's case: "if she has objective findings of significant complaints of her knees, then . . . that will likely end up putting [her] at sedentary," which will determine "whether or not she's going to receive benefits."  (*Id.* at Tr. 47, PAGEID #: 90).  The ALJ said he would "consider th[e] motion."  (*Id.*).

### 4. Additional Evidence Regarding Plaintiff's Knee Problems

The remainder of the record contains relatively few meaningful mentions of Plaintiff's knee problems.  Gary Sarver, a psychologist, issued a psychological evaluation of Plaintiff in May of 2006 containing Plaintiff's statement that she "feels she cannot work now because of '[her] bad knee.'"  (*See* Doc. 9 at Tr. 304, PAGEID #: 347).  During an August 5, 2011, visit to Holzer Medical Center in Galipolis Plaintiff reported trouble walking up stairs due to knee pain. (*See id.* at Tr. 308, PAGEID #: 351).  Plaintiff also complained of bilateral knee pain during a visit to Holzer on November 6, 2013.  (*See id.* at Tr. 471, PAGEID #: 514).  Doctors Mormol and Gardner, state-agency reviewing physicians, also issued opinions on the case.  (*See id.* at Tr. 90–116, PAGEID #: 133–60).  Their reports do not discuss Plaintiff's knee pain.

**C. The ALJ's Decision**

Relevant to this appeal, the ALJ found Plaintiff's knee pain non-severe, discounted the severity of Plaintiff's knee-related limitations in the residual functional capacity ("RFC") analysis, and denied benefits.

As to the severity finding, the ALJ noted Plaintiff's knee problems did "not cause a significant limitation in her ability to perform basic work activities." (Doc. 9 at Tr. 15, PAGEID #: 58). Though Plaintiff "testified as to having significant restriction in standing and walking due to knee pain," the ALJ concluded "the record is not supportive of the severity of her complaint." (*Id.*). He also cited Plaintiff's April 19, 2012, visit to Holzer. Despite telling the nurse her "knee was giving out" because of her 2011 fall, the examination report indicated Plaintiff "had equal strength bilaterally in the lower, as well as the upper extremities." (*Id.*).

The ALJ then turned to Dr. Kimbrough's report. He noted the report did not reveal any "range of motion deficits or significant tenderness to the knees." (*Id.* at Tr. 15, PAGEID #: 58). Although the ALJ acknowledged unsuccessful x-rays, he pointed out Dr. Kimbrough's finding that the images nevertheless indicated "no erosive changes or fractures," and that Plaintiff demonstrated "intact fine motor abilities." (*Id.* at Tr. 16, PAGEID #: 59). The ALJ further cited Plaintiff's admission that her pain did not wake her up at night, that the ibuprofen she was taking had helped with pain management, and that she chose not to pursue orthopedic treatment. (*See id.*). Based on all of this, he concluded that Plaintiff's pain was not severe. (*Id.*).

In the RFC analysis, the ALJ discussed Dr. Brendemuehl's and Dr. Kimbrough's opinions. The ALJ noted Dr. Brendemuehl's observation that Plaintiff failed to follow up with a referral to see a specialist about her knee pain, that Plaintiff does not use a device to help her walk, and that, in Dr. Brendemuehl's opinion, Plaintiff's alleged ailments called for fairly mild

7

limitations in the work place. (*See id.* at Tr. 21–22, PAGEID #: 64–65). The ALJ agreed with Dr. Brendemuehl that Dr. Kimbrough's examination was "conflicting and confusing" and therefore gave it little weight. (*Id.* at Tr. 22, PAGEID #: 65).

At the end of the RFC analysis, the ALJ addressed Plaintiff's request for another consultative examination and x-rays. He declined the request, finding "the record as a whole [wa]s not supportive of the need" for either. (*Id.* at Tr. 23, PAGEID #: 66). Despite giving Dr. Kimbrough's opinions little weight, the ALJ relied on the statement from Dr. Kimbrough's report that Plaintiff "showed no tenderness or limitation in range of motion of the knees." (*Id.*). The ALJ also noted Plaintiff "did not seek follow-up evaluation or treatment of the knees," and, according to his view of the record, her "participat[ion] in significant activities requiring standing and walking, including childcare, which are inconsistent with the restrictions alleged." (*Id.*).

## III. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account

whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. Nat'l Labor Relations Bd.*, 296 F.3d 384, 395 (6th Cir. 2002).

## IV. DISCUSSION

### A. Plaintiff's X-Rays

At the first hearing, Plaintiff asked for a consultative examination and x-rays so the ALJ could make an informed decision about her knee pain. The ALJ agreed and ordered both. The consultative report and x-rays came back and, by all accounts, were unhelpful; the medical expert called the report confusing and said the x-rays could not be interpreted. The ALJ agreed and gave the consultative examiner's opinions little weight. Plaintiff asked the ALJ to order another consultative examination and more x-rays. The ALJ denied this request (and went on to deny benefits). The principal issue on appeal is whether the ALJ erred in not ordering a follow-up consultative report and additional x-rays of Plaintiff's knees.

Several applicable regulations provide the answer. The ALJ has discretion in whether to order a consultative examination. 20 C.F.R. § 416.912(e) ("Obtaining a consultative examination. We *may* ask you to attend one or more consultative examinations at our expense." (emphasis added)). Here, the ALJ exercised that discretion at the first hearing on July 3, 2013, when he granted Plaintiff's request for a consultative examination and x-rays. Once he did, 20 C.F.R. § 416.919p, titled "Reviewing reports of consultative examinations," applied. It states that an ALJ "*will* contact the medical source who performed the consultative examination" to ask for any missing information or for the examiner to issue a revised report "[i]f the report is inadequate or incomplete." 20 C.F.R. § 416.919p(b) (emphasis added).

This leads to the question of whether Dr. Kimbrough's report was either inadequate or incomplete. If so, the ALJ was required to have the report supplemented. Dr. Kimbrough's report was both.

For a report to be complete, it "should include . . . [t]he results of laboratory and other tests (*e.g.*, *x-rays*) performed." 20 C.F.R. § 416.919n(c)(4) (emphasis added). The report here failed this standard because the x-rays were of no use. Dr. Kimbrough admitted as much in the "diagnostic imaging" section of his report. (Doc. 9 at Tr. 460, PAGEID #: 503 ("Radiographs of the lateral right and left knees were obtained in obliquity limiting assessment for effusion. . . . AP images were technically unsuccessful bilaterally, limiting assessment for joint narrowing.")). Dr. Brendemuehl, the medical expert who testified at the second administrative hearing, agreed. As she "read the evaluation and the record of the evaluation, . . . we have no x-rays." (*Id.* at Tr. 42, PAGEID #: 85). She continued, calling the x-rays "not interpretable." (*Id.*). In her opinion, "the views that were obtained were the wrong views and . . . the quality of films was poor." (*Id.* at Tr. 46, PAGEID # 89).

The report was also inadequate. The regulations again provide guidance. According to 20 C.F.R. § 416.919a(b), which speaks to "[w]hen [an ALJ] will purchase a consultative examination and how [she or he] will use it," an ALJ may order a consultative examination when "the evidence as a whole is insufficient to support a determination or decision on" someone's claim. It stands to reason that a report is inadequate if, even after the report issues, "the evidence as a whole is [still] insufficient to support a determination or decision on" someone's claim. That is exactly the case here. At the first hearing, Plaintiff's counsel asked for a "physical CE, specifically with x-rays of both of her knees" if the ALJ "fe[lt] this evidence *would be necessary* before [he] could come to a final decision." (Doc. 9 at Tr. 84, PAGEID #: 127 (emphasis

10

added)). The ALJ stopped the hearing, ordered the x-rays, and continued the proceedings with the expectations of usable x-rays. He thus thought they were necessary to his decision. The report did not contain x-rays that anyone could interpret or use.

Notably, Dr. Brendemuehl, whose opinion the ALJ gave great weight, agreed. She called the exam "conflicted" and "confus[ing]." (*Id.* at Tr. 43, PAGEID #: 86). She said she was "a little taken aback by [Dr. Kimbrough's] evaluation" (*id.* at Tr. 48, PAGEID #: 91), because it was "a very cursory exam" that fell short of the "several thousand" similar consultative exams she had read and analyzed in the past (*id.* at Tr. 49, PAGEID #: 92; *see id.* ("[T]he report is – is really not the usual in-depth physical exam that I often read.")). She further testified that "a good x-ray image" of Plaintiff's knees could "provide more information to demonstrate why she's having this ongoing pain." (*Id.* at Tr. 46, PAGEID # 89). In other words, Dr. Brendemuehl considered the x-rays necessary to evaluate Plaintiff's alleged disability.

This brings things back to 20 C.F.R. § 416.919p(b), which, again, requires an ALJ to contact the consultative examiner for more information or a revised report if the report is inadequate or incomplete. The report here was both. The ALJ still did not contact Dr. Kimbrough to fix the problem, meaning the ALJ did not make his decision according to the proper legal standard set by 20 C.F.R. § 416.919p(b).

The Commissioner contends an ALJ has discretion to determine whether additional evidence is necessary. Although true, *see, e.g.*, *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010), this legal proposition does not help the Commissioner here. While an ALJ has discretion to determine whether additional evidence is necessary, the ALJ here exercised that discretion at the first hearing when he ordered the x-rays and consultative examination. After the

11

ALJ exercised his discretion, he was required to comply with 20 C.F.R. §416.919p(b), which he did not do.

**B. Harmless Error**

The Commissioner responds that any mistake was harmless because substantial evidence supports the ALJ's conclusion regarding Plaintiff's knee problems. *See, e.g.*, *Mullins v. Astrue*, No. CIV.A.08-200-JBC, 2009 WL 982064, at *3 (E.D. Ky. Apr. 13, 2009) ("The record before the ALJ was not incomplete to allow the ALJ to determine the issue of disability. . . . The findings of the ALJ are supported by substantial evidence."); *see also Belville v. Comm'r of Soc. Sec.*, No. 3:10CV627, 2011 WL 3922320, at *6 (N.D. Ohio Sept. 7, 2011) ("20 C.F.R. § 416.919p(b), . . . provides that the ALJ will contact the examining source for clarification '[[i]f the report is inadequate or incomplete.' . . . [S]ubstantial evidence supported her R.F.C. finding and her conclusion that Dr. Bhaiji's report accorded with it and with the other medical evidence. . . . The . . . error is therefore harmless."); *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 857 (N.D. W. Va. 2009) ("An ALJ is required to re-contact medical sources only when the evidence before him is inadequate to determine whether the Claimant is disabled."). The Court disagrees.

The substantial evidence analysis asks whether a reasonable mind would find the evidence the ALJ cited adequate to support the ALJ's conclusion. *Rogers*, 486 F.3d at 241. Courts do not answer this question in a vacuum. Context matters, and substantial evidence depends on "the record as a whole." *Dotson v. Apfel*, 234 F.3d 1267, No. 99-6163, 2000 WL 1562817, at *1 (6th Cir. Oct. 10, 2000) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see id.* at *2 (analyzing substantial evidence "in the context of the complete record"); *see also Flint ex rel. Flint v. Comm'r of Soc. Sec.*, No. 3:07CV211, 2008 WL

4449505, at *2 (S.D. Ohio Sept. 30, 2008) ("The [ALJ]'s reference to Dr. Perilman's 'conclusions' from the opinion rendered after the second hearing cannot be viewed in a vacuum . . . ."); *cf. Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (noting that ALJ cannot "cherry-pick[] select portions of the medical record"). Three points provide context for how the substantial evidence analysis applies in this case.

First, the substantial evidence argument becomes more difficult for the Commissioner to make where, as here, the ALJ acknowledges both that the x-rays were necessary to his decision and that the corresponding consultative examination was inadequate or incomplete. *See, e.g.*, *Jenkins v. Astrue*, No. 3:10-CV-00546-J-JBT, 2011 WL 839404, at *4 (M.D. Fla. Mar. 7, 2011) ("The ALJ ordered the consultative examination because he needed it. . . . If the ALJ could not understand the report, it did no good to order it." (citations omitted)); *McMillan v. Astrue*, No. 3:08-CV-609-J-HTS, 2009 WL 651144, at *4 (M.D. Fla. Mar. 12, 2009) ("If, as is suggested by the hearing transcript quoted above, the ALJ perceived the 'report [was] inadequate or incomplete,' he should have recontacted the source and requested 'the missing information or' a revision."); *Dyson v. Massanari*, 149 F. Supp. 2d 1018, 1026 (N.D. Ill. 2001) ("[The ALJ] reached his no-disability decision without the benefit of x-rays of Dyson's knees. It is difficult to understand why he did so, for both Dr. Stevens and the ALJ himself recognized the importance of such x-rays in making the disability determination. Thus the ALJ was playing with less than what he himself had characterized as needed to make up a full deck." (citation omitted) (footnote omitted) (citing 20 C.F.R. § 416.919p(b))).

Second, the substantial evidence bar is hard to meet where, as here, the doctor conducting the consultative examination was the only examining physician to give an opinion on the impairment at issue. *See Smith ex rel. D.R. v. Astrue*, No. 10-CV-00053 GTS, 2011 WL

1113779, at *4 (N.D.N.Y. Jan. 20, 2011), *report and recommendation adopted*, No. 10-CV-0053 GTS VEB, 2011 WL 1113761 (N.D.N.Y. Mar. 23, 2011) ("The Court notes that because Dr. Payne was the sole examining physician to provide an opinion of D.R.'s functioning despite his impairments, her opinions are particularly probative. Thus, the Court finds that the ALJ erred in discounting Dr. Payne's opinions without first requesting that she provide a more detailed description of D.R.'s functioning." (citation omitted)); *Jenkins*, 2011 WL 839404, at *4 (reversing where the ALJ failed to clarify an examining physician's report, in part because the doctor "was the only examining physician to render an opinion on Plaintiff's functional limitations"); *see also* 20 C.F.R. § 404.1527(d)(1) ("Generally, [the ALJ] will give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not . . . .").

Third, a claimant can argue against harmless error by showing that the ALJ's failure to consider evidence could have altered the outcome in the case. *See Mullins v. Astrue*, No. CIV.A.08-200-JBC, 2009 WL 982064, at *3 (E.D. Ky. Apr. 13, 2009) (noting the lack of "any additional information that might have led to a different result"); *cf. Mitchell v. Colvin*, No. 1:15CV00299, 2016 WL 843310, at *7 (M.D.N.C. Mar. 1, 2016). For this argument, Plaintiff relies on Grid Rule 201.09. The Grid Rule requires a disability finding for someone closely approaching old age, with limited education, little to no prior work experience, and a work level of sedentary. *See* 20 C.F.R. § 404, Subpt. P, App. 2; *see also* 20 C.F.R. § 416.963(d) (defining "closely approaching old age" as someone who is 50–54); *Whitehead v. Colvin*, No. CV 14-209-GFVT, 2016 WL 1222253, at *5 (E.D. Ky. Mar. 28, 2016) (age defined "at the time the ALJ issued his decision"). The record shows the Plaintiff satisfies the first three requirements.

The x-rays, Plaintiff contends, might prove the fourth requirement—a work level of sedentary. The Commissioner does not counter this argument. Moreover, Dr. Brendemuehl, the doctor on whom the ALJ relied, agreed that the x-rays could make a difference. (*See* Doc. 9 at Tr. 46, PAGEID # 89 (testifying that "[t]he x-rays are . . . the first step for" answering "why she's having this ongoing pain and complaints")). Without any counterargument, and with a statement of agreement from the medical expert whose opinion the ALJ gave great weight, the Court has no reason to disagree that the x-rays might prove the fourth requirement.

Accordingly, the substantial evidence question here is: given that the ALJ (and the medical expert) agreed the x-rays were necessary; that the report was inadequate and incomplete; that Dr. Kimbrough was the only examining physician to provide evidence as to Plaintiff's knee pain; and that the x-rays could bear on Plaintiff's work level and the ultimate decision to as to disability, would a reasonable mind accept the evidence the ALJ relied on as adequate to support his conclusion about Plaintiff's knees? The answer is no.

Moreover, the evidence the ALJ cited, and on which the Commissioner relies, does not save the ALJ's decision. For example, the ALJ relied on Dr. Kimbrough's report to support his conclusion about Plaintiff's knee-related limitations, yet he also discredited the same report, calling it "conflicting and confusing" and giving "little weight" to its opinions. (*Id.* at Tr. 22, PAGEID #: 65). He additionally cited Dr. Brendemuehl's testimony for support, even though she admitted her testimony was based in large part on the consultative report that she and the ALJ found substandard. (*See id.* at Tr. 41, PAGEID #: 41). The other evidence relied upon is equivocal. For example, the ALJ cited records that either offer conflicting evidence regarding Plaintiff's knee issues or have nothing to do with her knee issues. (*See id.* at Tr. 15 (citing Exhibits 6F, 8F, and 15F); *but see id.* at Tr. 361–62, PAGEID #: 404–05 (treatment record

15

relating to Plaintiff's lower back pain, noting Plaintiff's knee sometimes gives out, and also noting, in formulaic language, she had "equal strength bilaterally in her upper and lower extremities"); *id.* at Tr. 384–85, PAGEID #: 427–28 (same); *id.* at Tr. 405, PAGEID #: 448 (record of a gynecological examination stating Plaintiff "complains of legs being swollen" followed by a note of "no pain in the legs"); *id.* at Tr. 409–10, PAGEID #: 452–53 (record regarding treatment for foot and heel pain); *id.* at Tr. 471–72, PAGEID #: 514–15 (treatment record noting Plaintiff's knee pain, and also noting, in the exact same formulaic language from the reports in the above citation, she had "equal strength bilaterally in her upper and lower extremities")).

Finally, the ALJ's reasoning for not contacting the consultative examiner is unpersuasive. He simply remarked on Plaintiff's unwillingness to see a specialist for her knees and noted that her activities (like "walking" and "childcare") were "inconsistent with the restrictions" she alleged. (*Id.* at Tr. 23, PAGEID #: 66). But considering the ALJ's admission that he needed the report and x-rays to make his decision in the first instance, his admission that the report and x-rays were incomplete and inadequate, and the otherwise slight record regarding Plaintiff's knees, the error of not contacting the consultative examiner was not harmless.

## V. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's statement of errors be **SUSTAINED**, and that the District Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## VI. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those

specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

    IT IS SO ORDERED.


Date: May 20, 2016　　　　　　　　　　　　　　/s/ Kimberly A. Jolson
　　　　　　　　　　　　　　　　　　　　　　　KIMBERLY A. JOLSON
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE